# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEWART N. GOLDSTEIN, M.D., individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-1061-JTL |
| ALEXANDER J. DENNER, SARISSA CAPITAL MANAGEMENT, L.P., SARISSA CAPITAL DOMESTIC FUND LP, SARISSA CAPITAL OFFSHORE MASTER FUND LP, and SARISSA CAPITAL MANAGEMENT GP LLC, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION DENYING
## CERTIFICATION OF INTERLOCUTORY APPEAL

Date Submitted: February 15, 2024
Date Decided: February 26, 2024

Kevin H. Davenport, John G. Day, Jason W. Rigby, Kirsten M. Valania, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; R. Bruce McNew, COOCH & TAYLOR P.A., Wilmington, Delaware; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Randall J. Baron, Rick T. Atwood, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Brett Middleton, JOHNSON FISTEL, LLP, San Diego, California; *Attorneys for Plaintiff.*

Stephen E. Jenkins, Richard D. Heins, ASHBY & GEDDES, P.A., Wilmington, Delaware; Tariq Mundiya, Sameer Advani, Richard Li, M. Annie Houghton-Larsen, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Defendants Alexander J. Denner, Sarissa Capital Management L.P., Sarissa Capital Domestic Fund LP, Sarissa Capital Offshore Master Fund LP, and Sarissa Capital Management GP LLC.*

**LASTER, V.C.**

Defendant Alexander Denner is the principal of Sarissa Capital, an activist hedge fund.[1] In 2017, he was also a director of Bioverativ, Inc., a publicly traded biopharmaceutical company. The plaintiff contends that Denner and Sarissa engaged in insider trading after Sanofi S.A. approached Denner about acquiring Bioverativ.

After the close of discovery, the plaintiff moved for sanctions (the "Sanctions Motion"). The Sanctions Motion invoked Court of Chancery Rule 37(e) and argued that the defendants failed to preserve electronically stored information ("ESI").

The defendants did not dispute the operative facts:

- None of the Sarissa custodians had any responsive texts.

- Denner does not know when he lost his texts. He thinks he may have lost them when he upgraded his phone in October 2021, after the plaintiff served his document requests in this action.

- Mark DiPaolo, Sarissa's general counsel, also does not know when he lost his texts. He thinks he may have lost them when he had his phone repaired in October 2020, after dropping it into a swimming pool.

- In 2018, Denner received two litigation holds instructing him to take affirmative steps to preserve his texts.

- In 2019, the SEC served Denner's hedge fund with two subpoenas that encompassed the events now at issue in this action.

- In response to the SEC subpoenas, DiPaolo issued a litigation hold instructing hedge fund personnel, including Denner, to take affirmative steps to preserve their texts.

- Denner and DiPaolo did not take affirmative steps to preserve their texts.

---

[1] Four entities in the Sarissa fund complex are defendants. This decision refers to them collectively as "Sarissa."

- Other hedge fund personnel did not take affirmative steps to preserve their texts.

- Sarissa's outside counsel asked Denner to consult with them before replacing his phone.

- Denner replaced his phone in October 2021 without consulting with outside counsel.

- In 2022, other parties produced texts that Denner sent between 2017 and 2018.

By opinion dated January 26, 2024, the court granted the Sanctions Motion (the "Opinion").[2] The Opinion found that ESI had been lost. The Opinion found that the defendants had not taken any affirmative steps to preserve their texts in response to the litigation holds. No one collected the defendants' texts. No one backed up their texts. Denner and DiPaolo did not preserve their phones. No one imaged any devices to preserve the data.

The Opinion found that the failure to preserve the texts caused prejudice to the plaintiff. The texts that other parties produced showed that Denner texted about Bioverativ during the relevant time period. That made it probable that Denner texted about other Bioverativ-related events, such as Sanofi's approach and Sarissa's trading. The failure to preserve the texts meant the plaintiff could not use them affirmatively. The plaintiff also could not use them defensively to impeach the testimony of Sarissa's witnesses.

---

[2] *Goldstein v. Denner*, --- A.3d ---, 2024 WL 303638 (Del. Ch. Jan. 26, 2024).

As sanctions, the plaintiff asked the court to:

- presume that when Denner and Sarissa purchased stock, they were motivated by Sanofi's initial expression of interest;

- preclude the defendants from offering any fact or expert testimony that would disavow *scienter*;

- preclude the defendants from offering any fact or expert testimony about alternative reasons for Sarissa's trades, such as a preexisting plan;

- presume that the destroyed texts would have supported the plaintiff's argument that the sale process fell outside the range of reasonableness because Denner maneuvered to secure a near-term sale that would lock in the profits from his insider trading.

Under Rule 37(e), those sanctions required either a finding of intentional non-preservation or recklessness.

The Opinion held that the defendants had acted recklessly. Denner and DiPaolo submitted affidavits in which they claimed they had not acted recklessly, but those assertions only reflected their subjective beliefs. The three litigation holds established that they knew about their preservation obligations, yet they did nothing to preserve their texts. Outside counsel told Denner to consult with them before replacing his phone, but he did not do that.

The Opinion did not grant all of the sanctions that the plaintiff requested. The Opinion granted the two adverse inferences that the plaintiff sought. The court did not grant either of the requested preclusion orders. Instead, the Opinion increased the defendants' burden of proof by one level, from a preponderance of the evidence to clear and convincing evidence.

The defendants have asked the court to certify an interlocutory appeal (the "Application"). The Application badly mischaracterizes the Opinion. In their zeal to

3

appeal, the defendants "emulate[] populist pundits from the extremes of the political spectrum who score points with their base by misleadingly reducing meaningful issues to simplistic sound bites."[3]

This memorandum opinion denies the Application. It is lengthy because, as Chief Justice Strine observed while serving on this court, "it is more time-consuming to clean up the pizza thrown at the wall than it is to throw it."[4] The Application splatters a lot of accusations across the wall that need cleaning up.

At bottom, the Opinion does not meet the substantial issue requirement. The Opinion also does not warrant appellate review now. Trial is scheduled to begin in April 2024, just two months from now. The defendants could prevail at trial, which would render the current dispute about the Sanctions Opinion moot. The proper time for appellate review is after a final order has been entered.

## I. FACTUAL BACKGROUND

The facts are drawn from the Opinion, which drew on the record presented in connection with the Sanctions Motion. Just as some understanding of the underlying case was necessary for the ruling on the Sanctions Motion, some understanding of the underlying case is necessary for the ruling on the Application.

In their effort to portray the Opinion as an outlier that warrants immediate reversal, the defendants repeatedly assert that the court made erroneous findings of

---

[3] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *4 (Del. Ch. Sept. 7, 2010).

[4] *Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 882 n. 184 (Del. Ch. 2012).

4

fact.[5] That is not true. A discovery ruling does not make findings of fact. It describes the record as it exists for purposes of the discovery motion.[6] The Opinion did not make any findings on the merits that could be law of the case for trial.

Based on their misunderstanding that the Opinion made findings of fact, the defendants attack the Opinion for failing to recognize that they should win on the merits. They insist that,

> Defendants filed documentary evidence flatly contradicting any insider trading allegations: Defendants received an email from Bioverativ's chairman that the Sanofi matter was "closed," confirmed that fact with Bioverativ's outside counsel, pre-cleared their trades with Bioverativ's

---

[5] *See, e.g.*, App. ¶ 2 ("The Court granted sweeping adverse inferences based on . . . erroneous 'facts.'"); *id.* ("The tone of the Opinion makes clear that, even without testimony, the Court has concluded that Defendants were lying, thus rendering trial moot."); *id.* at ¶ 5 ("[T]he Opinion . . . got facts wrong . . . .").

[6] *See, e.g.*, *Hyde Park Venture P'rs Fund III, L.P. v. FairXchange, LLC*, 292 A.3d 178, 184–85 (Del. Ch. 2023) ("The facts are drawn from the parties' submissions in connection with the motion to compel. Given the procedural posture, this decision does not make formal findings of fact. Instead, the following summary reflects how the record appears at this stage of the proceedings for purposes of the discovery ruling."); *In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *43 (Del. Ch. Sept. 28, 2021) ("A court's factual assessments in a discovery ruling do not constitute factual findings that remain dispositive at later stages of the case. A court's factual assessments in a discovery ruling rather reflect how the evidence appears at that earlier stage of the case for purposes of informing the court's rulings on discovery."); *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *1 (Del. Ch. Dec. 4, 2018) ("Because this is a discovery ruling, the description of events provided in this section does not constitute formal findings of fact. It only represents how the record appears at this preliminary stage."); *In re Activision Blizzard, Inc.*, 86 A.3d 531, 533 (Del. Ch. 2014) ("What follows are not formal factual findings, but rather how the court views the record for purposes of a discovery ruling."); *In re Info. Mgmt. Servs., Inc. Deriv. Litig.*, 81 A.3d 278, 282 (Del. Ch. 2013) ("The facts for purposes of the motion to compel are drawn from the allegations in the pleadings and the exhibits and affidavits submitted in connection with the briefing on the motion. What follows are not formal factual findings, but rather how the court views the record for purposes of a discovery ruling. At this stage of the case, the court cannot resolve conflicting factual contentions.").

inside counsel, and then disclosed those trades publicly through contemporaneous Form 4s.[7]

The defendants then proceed to criticize the Opinion for not accepting their assertions. But the plaintiff has responses to each point, and the issues remain contested. While the defendants may ultimately prevail, the Opinion was not deciding the merits. It was deciding the Sanctions Motion. A court does not decide a discovery motion based on who will win at trial. A court decides a discovery motion based on what happened during discovery.

The defendants' factual attacks on the Opinion are thus generally misplaced. The following account includes more specific responses to those attacks.

## A.    Sanofi's Approach

In May 2017, Sanofi approached Denner and Brian S. Posner, another director of Bioverativ. Sanofi expressed interest in acquiring Bioverativ for $90 per share. Bioverativ's stock closed that day at $54.86 per share, so the proposal represented a 64% premium to market. Denner and Posner told Sanofi that the time was not right for an acquisition. No one disputes this.

There are factual disputes about what happened next. The record for the Sanctions Motion indicated that Posner reported to the Board about Sanofi's interest. But the record did not include any contemporaneous documents evidencing that he shared the price. The deposition testimony that the parties submitted showed that

---

[7] App. ¶ 1.

6

except for Posner and Denner, none of the Bioverativ directors recalled knowing the price. The plaintiff contends that Posner did not share the price.

The Opinion described the record as it existed for purposes of the Sanctions Motion. It stated:

> Denner and Posner told Sanofi that the time was not right for an acquisition. The discovery record to date indicates that Posner reported Sanofi's interest to Bioverativ's other directors, but did not mention the price. There are no contemporaneous documents evidencing board consideration or acknowledgement of the offer, and there was no board vote on a response. All of the Bioverativ directors testified that they knew about Sanofi's approach. Except for Posner and Denner, none recalled knowing the price. A contemporaneous email from Posner to outside counsel references the Sanofi approach without mentioning the price.[8]

That was an accurate description. The evidence at trial may show something different.

## B.    Sarissa Buys Stock.

Just days after Denner's meeting with Sanofi, Sarissa's head trader began purchasing Bioverativ stock.

- On May 24, 2017, Sarissa purchased 340,000 shares.

- On May 25, 2017, Sarissa purchased 130,000 shares.

- On May 26, 2017, Sarissa purchased 450,000 shares.

- On May 30, 2017, Sarissa purchased 90,000 shares.

---

[8] Op. at *2.

Before those purchases, Sarissa only owned 155,000 shares. Within a week after Denner's meeting with Sanofi, Sarissa had purchased 1,010,000 shares for $56.3 million. Bioverativ went from being 3.3% of Sarissa's portfolio to 27.7%.

No one disputes this. Instead, the critical issue in the case is whether by engaging in those trades, Denner breached his fiduciary duties to Bioverativ and its stockholders. Not surprisingly, there are factual disputes about what various participants knew or believed when Denner and Sarissa made those trades.

### 1. The Dispute Over DiFabio's Pre-Clearance Of The Trades

One of the defendants' arguments on the merits is that DiPaolo asked Andrea DiFabio, the general counsel of Bioverativ, whether Sarissa could trade and that DiFabio gave Sarissa the go-ahead. The defendants contend that the Opinion "omits crucial discussions where DiFabio (who will testify at trial) consulted Posner and outside counsel *before* responding to DiPaolo."[9]

In the Sanctions Motion, the plaintiff argued that DiPaolo did not mention Sanofi's $90 per share offer in the email he sent to DiFabio, and DiFabio testified that she did not know about it.[10] Thus, while it is true that DiFabio told DiPaolo that she did not know of anything that would bar Sarissa from trading, it is not clear that she was in a position to clear Sarissa's trades.

---

[9] App. ¶ 20.

[10] Dkt. 204 ¶ 5.

8

The Opinion described the record as it existed for purposes of the Sanctions Motion. It stated:

> Before Sarissa's first purchase, its general counsel (Mark DiPaolo) emailed Bioverativ's general counsel (Andrea DiFabio) to ask if she was aware of any material non-public information that could limit Sarissa's ability to trade. DiPaolo did not mention Sanofi's $90 per share offer, and DiFabio testified that she did not know about it. She therefore told DiPaolo that she did not know of anything.[11]

That was an accurate description of what the record showed. The evidence at trial may show something different.

## 2. Factual Disputes Related To Sarissa's Intent

One of the issues at trial will be whether Denner and Sarissa acted with *scienter* by trading based on what they knew about Sanofi's approach. There are several disputes of fact that are relevant to a finding of intent. The Opinion did not resolve any of them.

### a. Whether There Was A Pre-Existing Plan

One issue pertinent to intent is whether Denner and Sarissa had already planned to rapidly accumulate a massive position in Bioverativ stock such that Sanofi's approach had nothing to do with it. The Opinion stated: "There is no contemporaneous evidence of any prior plan to rapidly acquire such a large position."[12] That is what the record on the Sanctions Motion showed.

---

[11] Op. at *3.

[12] *Id.*

9

The defendants now complain that the court made this observation "even though Defendants' business model includes acquiring shares during open trading windows . . . ."[13] A business model may well be relevant to whether the defendants had such a plan, but it is not contemporaneous evidence of such a plan.

The defendants also complain that "contemporaneous evidence shows that Paglia and Posner (who will testify at trial) were aware of Defendants' desire to increase their position."[14] One of the documents the defendants cite is a joking email sent three months before Sanofi's approach. Denner said he was ill and Paglia responds, "You are sick because BIVV keeps rising and you cannot buy it!! Feel better."[15] The other exhibits relate to the trading that Sarissa engaged in. None reflect a prior plan to rapidly acquire Bioverativ stock.

The Opinion thus correctly described the record for purposes of the Sanctions Motion. There was no contemporaneous evidence of a plan to buy such a large block of Bioverativ stock. The record also did not include any internal Sarissa communications about such a plan. The one exception was an email in which Denner told the head trader to "Keep going."[16] The defendants now say that they "produced numerous emails relating to the trades—which would have been part of the trial

---

[13] App. ¶ 20.

[14] *Id.*

[15] *Id.* Ex. E.1.

[16] Op. at *3.

10

record."[17] Thirteen of the twenty-one were not included with the Sanctions Motion.[18] Most are external communications with Bioverativ or internal communications within Bioverativ. Only three are internal communications within Sarissa.[19] Two are "FYI" emails about communications with Bioverativ.[20] None contain instructions to start buying. None express or allude to a rationale for buying. None set parameters for the purchases. None provide a rationale for the size of the individual or total purchases. None contain instructions to stop buying.

The Opinion thus correctly stated: "There is no contemporaneous evidence of any prior plan to rapidly acquire such a large position."[21] The defendants may well prove otherwise at trial, but that is what the record on the Sanctions Motion showed.

### b. Whether Sanofi Was Likely To Come Back

Another fact pertinent to intent is whether Sanofi was likely to come back. If not, then it becomes less likely that Sanofi's approach motived Denner and Sarissa's trading.

In the Application the defendants twice observe that Posner circulated an email in which he reported that he had spoken with Sanofi's Chairman and that the

---

[17] App. ¶ 20 (citing Exs. E.1–20).

[18] *See* App. Exs. E.6–13, E.16–20.

[19] *See* App. Exs. E.7, E.13 & E.19.

[20] *See* App. Exs. E.13 & E.19.

[21] Op. at *3.

Chairman said he viewed the discussions as "closed."[22] They complain that the Opinion did not focus on this exchange.

Posner's email supports the defendants' position. But the record shows that Sanofi did not act like the discussions were closed and did in fact come back. Moreover, what matters is not what Posner said (although that is relevant evidence), but what Denner knew. The Opinion did not make any factual findings on those points. They remain disputed issues for trial.

### c. Who Else Traded

A third intent-related fact is whether anyone else traded after Sanofi's approach. If the only individuals who knew about the price were Denner and Posner, and if they behaved differently than the other directors, then that could support an inference of intent.

The Opinion stated: "Posner was the only other Bioverativ director who knew about the price. He bought 2,000 shares for approximately $53.80 per share, representing a total investment of $107,600. No one has suggested that the other Bioverativ directors suddenly purchased shares."[23]

On this point, the Opinion was mistaken. Paglia also purchased 2,000 shares during the trading window for approximately $57.76 per share.

---

[22] App. ¶¶ 1, 12.

[23] Op. *3.

12

That error did not affect the outcome in the Opinion. The defendants are free to emphasize Paglia's trading at trial. If they wish, they can remind the court that the Opinion got that point wrong. After trial, when determining whether the defendants acted with *scienter*, the court will take into account Paglia's trading.

### d. The Fact That The Defendants' Disclosed Their Trades

In the Application, the defendants stress that they disclosed their trades on Form 4s.[24] They made similar points in response to the Sanctions Motion.[25] They seem to think that the filings are relevant to their lack of intent.

At some point, the defendants will have to explain how disclosure of their trades fits into their theory of the case. The federal securities laws required that the defendants disclose their trades. If they had not disclosed their trades, they would have had another legal problem, in addition to the legal problem that the plaintiff contends they had. This case is not about whether they disclosed their trades. This case is about what they knew when they made their trades.

This is another issue that the defendants can address at trial. It had no bearing on the Opinion.

### e. The Dispute Over The Role Of Section 16

A final intent-related issue is the role of potential liability for short-swing profits under Section 16 of the federal securities laws. One of the defendants'

---

[24] *See* App. ¶¶ 1, 12.

[25] *See*. Dkt. 199, ¶¶ 1, 21.

arguments on the merits is that the timing of Bioverativ's re-engagement with Sanofi, just over six months after Sanofi first approached Denner, had nothing to do with the short-swing profit period under Section 16. The plaintiff, by contrast, has contended from the outset that Section 16 applies and affected the timing Bioverativ's re-engagement.[26]

The Opinion described this issue as follows:

Sarissa stood to make massive profits if Sanofi acquired Bioverativ, but Section 16(b) of the Securities Exchange Act of 1934 loomed as an impediment. That statute requires that an insider disgorge short-swing profits from any sale that takes place less than six months after the purchase. Denner's solution was to delay any engagement with Sanofi so that the sale would take place after the short-swing period closed.

When Sanofi reapproached in June 2017 and again in September 2017, Denner responded that Bioverativ was not for sale. The discovery record indicates that he did not report those contacts to the board. *See* PX 11.

By October 2017, the short-swing period was about to expire. This time, when Sanofi came calling, Denner proposed a single-bidder process. The board knew nothing about that inquiry.

Several weeks later, in late November 2017, Sanofi offered to acquire Bioverativ for $98.50 per share. Bioverativ's management team and its financial advisors valued the company at more than $150 per share. After receiving Sanofi's offer, the directors asked for a higher bid, and Sanofi increased its offer to $101.50. At that point, the directors countered at $105 per share, almost one-third below the standalone valuation. Sanofi accepted.[27]

---

[26] *See, e.g.*, Dkt. 1 ¶¶ 5, 105; Dkt. 195 ¶ 2.

[27] Op. at *3 (heading omitted).

14

No one disputes the timing or substance of these events. No one disputes that "Sarissa stood to make massive profits if Sanofi acquired Bioverativ."[28]

To attack the Opinion, the defendants say that Section 16 "does not apply to the Sanofi transaction as a matter of law."[29] The Opinion did not rule on a motion for summary judgment. It ruled on the Sanctions Motion. The defendants are free to raise what they seem to think is a case-dispositive legal argument in their post-trial briefing.

The defendants also attack the Opinion by contending that "[t]here is zero evidence showing that the Denner [sic] was motivated by the Section 16 short-swing period . . . ."[30] Circumstantial evidence is evidence, and the timing and substance of how events transpired is circumstantial evidence.

Regardless, the Opinion did not make a factual finding about Denner's intent. The defendants are free to present their evidence at trial on that issue.

## C. The Negotiations

The record on the Sanctions Motion indicated that Denner led the negotiations for Bioverativ. His counterpart for Sanofi was Stephen Sands, a Lazard banker. Denner and Sands had known each other professionally for over a decade. No one disputes this.

---

[28] *Id.*

[29] App. ¶ 20 (citing *SEC No Action Letter*, 1999 WL 11540 (Jan. 12, 1999)).

[30] *Id.*

The record on the Sanctions Motion showed that Denner and Sands texted during the negotiations. As the Opinion stated: "None of those texts exist."[31]

Now, the defendants claim otherwise, but in a way that confirms the point. They say: "Sands testified that he copies his substantive texts into his emails, which included a text with Denner."[32] In other words, none of the texts exist as texts, but the substance of one text has survived as an email. Even non-substantive texts are important for establishing timelines and revealing when communications occurred. The Opinion correctly observed that, "[n]one of those texts exist."[33]

## D. The Three Litigation Holds

Now comes the part of the factual story where the defendants have no responses. Over the next two years, Denner and Sarissa received three litigation holds that instructed them to preserve their texts. No one disputes this.

### 1. The Bioverativ Hold

On January 21, 2018, Bioverativ and Sanofi announced their transaction. On February 8, 2018, Bioverativ filed its proxy statement.

Stockholders filed putative class actions challenging the sufficiency of the proxy statement. On February 21, 2018, Bioverativ's general counsel circulated a litigation hold (the "Bioverativ Hold"). The Bioverativ Hold instructed recipients to

---

[31] Op. at *3.

[32] App. ¶ 20.

[33] Op. at *3.

16

take steps to preserve ESI. The Bioverativ Hold expressly extended to text messages. No one disputes this.

Denner received the Bioverativ Hold. When briefing the Sanctions Motion, Sarissa did not submit any evidence suggesting that Denner took any action in response to the Bioverativ Hold. They did not submit any evidence suggesting that Sarissa took any action, either. The Opinion noted both facts and observed that if they had taken any action, then the lost text messages would have been preserved.[34]

### 2. The Sanofi Hold

On March 15, 2018, Sanofi issued a litigation hold (the "Sanofi Hold"). The Sanofi Hold specifically called out text messages on smart phones. It also specifically identified the need to take affirmative steps to preserve ESI. No one disputes this.

Denner received the Sanofi Hold. When briefing the Sanctions Motion, the defendants did not submit any evidence suggesting that Denner took any action in response to the Sanofi Hold. They did not submit any evidence suggesting that Sarissa took any action, either. The Opinion noted both facts and observed that if they had taken any action, then the lost text messages would have been preserved.[35]

### 3. The Sarissa Hold

On September 4, 2019, the SEC served subpoenas on Denner and Sarissa. They sought: "All Documents Concerning [Bioverativ] or trading in the securities of

---

[34] *Id.* at *4.

[35] *Id.*

[Bioverativ]," "All Communications with Sanofi," and "All Communications with Denner Concerning Sanofi, [Bioverativ], or trading in the securities of [Bioverativ]."[36] On September 5, 2019, DiPaolo circulated a litigation hold (the "Sarissa Hold") to "All staff."[37]

The Sarissa Hold instructed all staff to "preserve any and all documents and/or communications with, concerning, relating to, or in any way discussing or mentioning Bioverativ, Inc. or Sanofi S.A."[38] It continued: "**Until otherwise notified, do not discard, delete, alter or destroy any such materials in your possession or under your control even if such documents would otherwise be routinely discarded or destroyed in the ordinary course of your business.**"[39] The Sarissa Hold expressly encompassed texts on personal devices. No one disputes this.

After circulating the Sarissa Hold, DiPaolo consulted with outside counsel about how to implement it. Outside counsel asked DiPaolo about texts. DiPaolo responded that he did not text for business and that he did not believe Denner did either, but he would verify that. DiPaolo and outside counsel decided not to collect texts at that time, but outside counsel asked that Sarissa's users preserve texts and check with counsel before buying a new phone and transferring data to a new device.

---

[36] *Id.* (citation omitted).

[37] *Id.*

[38] *Id.* at *5.

[39] *Id.*

18

DiPaolo averred in an affidavit that he personally went through Denner's phone looking for text messages relating to "Sarissa's purchases of Bioverativ securities."[40] The Opinion noted that the scope of the SEC subpoenas was much broader: It sought "[a]ll Communications with Denner Concerning Sanofi, [Bioverativ], or trading in the securities of [Bioverativ]."[41]

DiPaolo claims he did not find any responsive text messages. In this action, other parties have produced text messages from Denner relating to Bioverativ. There are also emails referring to text messages from Denner relating to Bioverativ.

At a follow-up meeting with outside counsel, DiPaolo reported that Sarissa's policies prohibited texting for business purposes. He reiterated that he had no recollection of texting himself. He said that he had reviewed Denner's texts and found nothing.

Based on DiPaolo's representations, outside counsel agreed to "table any collection of mobile data/text messages at this time but asked [Denner] to preserve this data."[42] Outside counsel asked Denner to contact counsel "for guidance should he want to buy a new device or discard the current device."[43]

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

19

When briefing the Sanctions Motion, the defendants did not submit any evidence suggesting that Denner took any action to preserve his data. There was also no evidence that Denner contacted anyone for guidance before replacing his phone. The Opinion stated: "There is no evidence that any steps were taken to preserve Denner's data. There is no evidence that Denner contacted anyone for guidance before replacing his phone."[44] No one disputes this.

DiPaolo sent the Sarissa Hold, so he necessarily knew about it. When briefing the Sanctions Motion, the defendants did not submit any evidence indicating that he did anything to preserve his data.[45] No one disputes this.

## E.     The Pool Incident

After the conclusion of briefing on the Sanctions Motion, and after an oral argument in which the defendants' counsel could not answer basic questions about their collection efforts, the court asked the defendants to provide additional documentation regarding what they did to preserve and collect documents. At that point, DiPaolo submitted an affidavit in which he described for the first time how he thought he lost his texts. He averred that he was personally cleaning his swimming pool when he accidentally dropped his phone into the water. He has a receipt showing he had the phone repaired on September 28, 2020.[46]

---

[44] *Id.* at *6.

[45] *Id.*

[46] *Id.*

DiPaolo's affidavit did not suggest that he lost other data, such as pictures, applications, or contacts. The Opinion noted that he did not seem to have suffered a traumatic event involving the loss of treasured photos or the hassle of restoring data from other sources. Instead, DiPaolo barely remembered the incident.[47] The defendants now take umbrage at these observations, which the Application describes as "scathing remarks."[48] In the Application, the defendants now say that a family member has since reminded DiPaolo that he had indeed lost photos of his deceased brother.[49] That is the type of information that the defendants should have provided in connection with the Sanctions Motion. They did not, but they can present that evidence at trial. It is relevant to whether DiPaolo acted intentionally, and the court will consider it for that purpose. It is not relevant to whether he recklessly failed to preserve his texts.

The Opinion also observed that DiPaolo believed he lost his texts as a result of the repair, yet the missing text messages are not tied to September 28, 2020.[50] He has no text messages from before October 9, 2020. The Opinion noted that it would

---

[47] *Id.*

[48] App. ¶ 14.

[49] *Id.*

[50] Op. at *6.

be strange for a repair to cause the loss of text messages sent during the twelve days after the repair took place.[51] The Application does not address that discontinuity.

## F.     This Lawsuit

On December 15, 2020, the plaintiff filed this lawsuit. Based on Sarissa's stock purchases, the plaintiff asserts a claim against Denner for breach of fiduciary duty, plus a claim against Sarissa for aiding and abetting Denner's breaches. In substance, the plaintiff asserts that Denner and Sarissa engaged in insider trading. The plaintiff also contended that Denner and the other directors breached their fiduciary duties by engaging in a sale process for Bioverativ that fell outside the range of reasonableness.

Denner and Sarissa moved to dismiss the claims against them under Rule 12(b)(6). After completing briefing, the plaintiff served document requests in September 2021. The defendants responded by moving to stay discovery. On November 18, 2021, the court denied the defendants' motion for a stay.[52]

It was only after the court's order that defense counsel began thinking about what sources of evidence would be responsive and should be identified, preserved, collected, reviewed, and potentially produced. The Opinion observed, "[t]hat was too

[51] *Id.*

[52] Dkt. 55.

22

late."[53] A duty to preserve evidence attaches when a party reasonably anticipates litigation. No one disputes that.

The Opinion noted that defense counsel was too late in another, more specific sense, because a second incident had occurred involving lost ESI:

> To repeat, the plaintiff served document requests in September 2021. Soon after, for reasons that no one has been able to explain, Denner lost all of his texts from before an as-yet unidentified date in October 2021. Denner recalls upgrading his iPhone to a new model, and he thinks the upgrade caused the loss. That would be bizarre, because Apple facilitates upgrades by transferring data to the new iPhone from the cloud. No one on the defendants' side has been able to explain why Denner's iPhone upgrade could have caused the loss of his texts.

> There is no evidence that Denner consulted with anyone before replacing his iPhone. The litigation holds told him to do that. Outside counsel asked him to do that.[54]

The Opinion observed that like DiPaolo, Denner has not suggested that he lost other data, such as pictures, applications, or contacts. Like DiPaolo, Denner barely remembered. Based on the record presented in connection with the Sanctions Motion, both DiPaolo's pool mishap and Denner's atypical iPhone upgrade seemed to have affected their text messages and nothing else.

## G. The Rulings On The Motions To Dismiss

In May 2022, the court issued a decision that denied the defendants motion to dismiss the sale process claims (the "Sale Process Decision").[55] In June, the court

---

[53] Op. at *7.

[54] *Id.*

[55] *See Goldstein v. Denner*, 2022 WL 1671006 (Del. Ch. May 26, 2022).

issued a decision that denied the defendants' motion to dismiss the insider trading claims (the "Insider Trading Decision").[56]

The Application takes gratuitous shots at the Insider Trading Decision. It asserts that "Plaintiff's *Brophy* claim never should have survived dismissal [because] Plaintiff lacks post-closing derivative standing under *Morris v. Spectra Energy Partners*, 246 A.3d 121, 134 (Del. 2021)," and it claims that the Insider Trading Decision "created a new test conferring standing on Plaintiff . . . ."[57]

That is not correct. As the Insider Trading Decision explained, the Delaware Supreme Court held in *Parnes*[58] that a plaintiff has standing to challenge the fairness of a merger if it is reasonably conceivable that the pending derivative claim (or the conduct that otherwise would support a derivative claim) affected *either* (i) the fairness of the merger price *or* (ii) the fairness of the process that led to the merger.[59] The Insider Trading Decision noted that "the weight of Delaware authority has interpreted *Parnes* as recognizing that a stockholder can assert a direct claim challenging a merger based on process challenges alone."[60] In other words, "standing

---

[56] *See Goldstein v. Denner*, 2022 WL 1797224 (Del. Ch. June 2, 2022).

[57] App. ¶ 4.

[58] *Parnes v. Bally Ent. Corp.*, 722 A.2d 1243 (Del. 1999).

[59] *See Insider Trading Decision,* 2022 WL 1797224, at *11.

[60] *Id.* at *12 & n.9 (collecting cases).

24

exists to assert a direct claim when a plaintiff alleges breaches of fiduciary duty that resulted in either an unfair price or an unfair process."[61]

The *Morris* decision that the defendants cite formalized the test for the first *Parnes* path; it did not rule out the second.[62] The Insider Trading Decision found it reasonably conceivable that the second path gave the plaintiff standing to challenge the merger.[63] That was not a "new test" that conflicted with *Morris*. It was an application of *Parnes* that *Morris* left open.

As the defendants concede, the Application does not seek to appeal the Insider Trading Decision.[64] The defendants' passing shot at the Insider Trading Decision is part of the pizza sauce splattered on the wall.

## H.    The Defendants Fail To Produce Any Texts.

After the denial of the motions to dismiss, the parties proceeded with discovery. Denner and Sarissa's production did not contain any texts. Other parties produced texts from Denner. Two directors produced forty-five texts, including texts sent during board meetings in which Denner complained about management's opposition to the Sanofi transaction.

---

[61] *Id.* at *12.

[62] *Morris*, 246 A.3d at 136.

[63] *See Insider Trading Decision*, 2022 WL 1797224, at *12.

[64] *See* App. ¶ 4.

The defendants assert that "[n]one of the texts produced in the litigation are 'favorable' to Plaintiff."[65] In a strict sense, that's true. But they show that Denner texted about Bioverativ during the negotiations with Sanofi, contrary to Denner and DiPaolo's assertions. No one will ever know what other texts might have shown or how helpful they could have been, because the defendants did not preserve them. As the defendants correctly point out, "there is no evidence that any missing texts would have helped Plaintiff."[66] That is unfortunately correct, and it is only correct because the defendants did not preserve any of their texts.

On June 14, 2022, the plaintiff informed defense counsel that Denner appeared to have texted for business purposes. The plaintiff asked defense counsel to add DiPaolo to the search protocol. They also asked to add Sarissa's Chief Compliance Officer (Patrice Bonfiglio), Sarissa's head trader (Pat Garofalo), and Denner's assistant.

At this point, defense counsel finally had one of its lawyers inspect Denner's devices. The inspection confirmed that Denner did not have any texts from before October 2021. Counsel checked Denner's iPad and saw texts from March 2020, but not earlier. Denner reported that he had not intentionally deleted any texts relevant to this action and said he did not understand why his text messages from the 2017–2018 time period were missing. Denner suggested that he had upgraded his iPhone

---

[65] *Id.* ¶ 12.

[66] *Id.*

and then provided his old phone to one of his sons. Later that month, DiPaolo reported that Denner's sons had newer devices that were not in existence at the time of the Bioverativ-Sanofi transaction.

Defense counsel discussed the issue of texts with DiPaolo and Bonfiglio, but did not conduct any formal custodian interviews. DiPaolo and Bonfiglio each represented that they had adhered to Sarissa's policy of not texting for business. Defense counsel accepted that representation and decided again against imaging Denner and Bonfiglio's phones or taking any other action to preserve text messages.

In October 2022, defense counsel finally answered the plaintiff's interrogatories, which included a question about whether the defendants had preserved potentially responsive information. Seven months after learning that Denner had no texts from before October 2021, defense counsel served the following response:

> [O]n or around October 2021, Alex Denner replaced his iPhone solely for the purposes of upgrading the device, a process which the Sarissa Defendants believe inadvertently caused his text messages prior to that date to no longer be accessible or retrievable from his current device. By way of further response, the Sarissa Defendants state that, in the Sarissa Capital Management LP Compliance Manual and Code of Ethics, Sarissa employees are not permitted to use text messages for official business correspondence (see SAR-BIVVID00000183). The Sarissa Defendants have sought to obtain iCloud backups, have contacted Verizon, have conducted searches of Denner's current iPhone and iPad devices for backup phone data (including with the assistance of Sarissa's outside counsel . . .), and have been unable to identify any means of recovering any text messages during the relevant time period agreed-to by the parties.[67]

_____

[67] Dkt. 195, Ex. 17 at Interrogatory No. 27.

27

The defendants thus asserted that Denner lost his text messages on some unidentified date in October 2021, one year before. That was after Denner had received three litigation hold notices, after this litigation began, after the plaintiff served discovery requests seeking texts, and just before the defendants moved to stay discovery.

The plaintiff understandably viewed Denner's upgrade story as inherently suspicious. During an upgrade, data is transferred to the new iPhone. Denner and Sarissa thus offered an explanation for his lost texts that made no sense.

Equally important, the defendants' response was misleadingly incomplete. The response said nothing about DiPaolo's prior loss of all of his texts due to the post-swimming-pool-incident repair.

## I.     More Issues With Texts

On December 7, 2022, during deposition preparation, Sarissa's head trader (Garofalo) informed defense counsel that he recalled using texts to communicate with Denner. But he said he had no recollection of any texts relating to Bioverativ.

Based on this disclosure, defense counsel finally reviewed DiPaolo, Bonfiglio, and Garofalo's phones.

- DiPaolo's phone had no texts from before October 9, 2020. He claimed not to know why at that time.

- Garofalo's phone had no texts. It was set to delete texts automatically after thirty days.

- Bonfiglio's device contained 116,868 texts. The earliest text was dated January 30, 2014. None of the search terms hit on any texts. In addition, defense counsel reviewed all of the texts and determined that none are responsive.

In short, none of the additional custodians had responsive texts.

28

In February 2023, the plaintiff pushed for more information about the defendants' failure to produce texts. Defense counsel responded with a letter plus a declaration from Denner. In both documents, they stuck to Denner's story about losing his texts when he upgraded his iPhone. At the same time, they seemed to know that the story did not make sense. The defendants also reported for the first time that DiPaolo, Garofalo, and Bonfiglio did not possess any responsive text.

**J.      The Sanctions Motion**

On November 14, 2023, the plaintiff filed the Sanctions Motion. The parties briefed it, and the court held a hearing on January 4, 2024. During the hearing, defense counsel could not answer basic questions about the collection process. To ensure that the defendants had the opportunity to document what they had done, the court directed the defendants to file an affidavit describing their preservation and collection plan and how they carried it out.

The defendants filed two affidavits. Defense counsel submitted an affidavit detailing their collection efforts. DiPaolo submitted a separate affidavit in which, among other things, he described the swimming pool incident for the first time.

DiPaolo did not address in his affidavit whether any of his data was backed up to the cloud or whether counsel had made any efforts to check his other devices. The court directed defense counsel to file a supplemental affidavit "explaining whether

29

any efforts were made to examine DiPaolo's other devices, the cloud, or other sources for text messages after the . . . swimming pool incident."[68]

Defense counsel reported that no data was backed up to the cloud or available from other devices. Defense counsel did not say what they did, or when, to make those determinations. The Opinion observed that defense counsel's silence suggested "that they only took those steps after the court asked."[69] The court regarded "the failure to provide any detail beyond a clipped response [as] a further example of defense counsel's lack of transparency and parsimony regarding the release of information. That approach has undermined their credibility on the spoliation issues."[70]

## K. The Opinion

On January 26, 2024, the court issued the Opinion. The court found that the defendants had failed to preserve ESI in the form of their texts, that the texts were irretrievably lost, and that failure to preserve ESI caused prejudice to the plaintiff.[71] The court also found that the failure to preserve texts had been reckless.[72] The court deferred ruling on intentionality until after trial.[73]

---

[68] Dkt. 213.

[69] Op. at *11.

[70] *Id.*

[71] *Id.* at *26–28.

[72] *Id.* at *30.

[73] *Id.* at *31–32.

As a curative sanction, the court held that it would presume at trial that Sarissa traded on the basis of Sanofi's approach.[74] The court also held that it would presume that the hedge fund's trading caused the sale process to fall outside the range of reasonableness.[75] Presumptions are inherently rebuttable.[76] Nevertheless, the court emphasized that both presumptions can be rebutted.[77] Because the defendants' spoliation deprived the plaintiff of evidence that they could use to impeach the defendants' testimony, the court held that the rebuttal of the presumptions would need to be by clear and convincing evidence.

On February 5, 2024, the defendants filed the Application.

## II.    LEGAL ANALYSIS

Supreme Court Rule 42 governs the certification of an interlocutory appeal. "[T]he purpose of Rule 42 is to prevent wasteful piecemeal litigation from overwhelming the docket of the Supreme Court."[78]

Rule 42 cautions that "[i]nterlocutory appeals should be exceptional, not routine, because they disrupt the normal procession of litigation, cause delay, and

---

[74] *Id.* at *28.

[75] *Id.*

[76] D.R.E. 301(a) ("In a civil case, unless a statute or these Rules provide otherwise, the party against whom a presumption is directed has the burden of proving that the nonexistence of the presumed fact is more probable than the existence of the presumed fact.").

[77] Op. at *28.

[78] *Stein v. Blankfein*, 2019 WL 3311227, at *1 (Del. Ch. July 23, 2019).

can threaten to exhaust scarce party and judicial resources."[79] Certification is "generally not favored."[80] Thus, an application for interlocutory appeal "requires a strict analysis by the trial court."[81]

Rule 42 states that "[n]o interlocutory appeal will be certified by the trial court or accepted by this Court unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment."[82] If the "substantial issue" requirement is met, then the trial court will analyze whether "there are substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal."[83] The rule identifies eight factors relevant to the assessment.[84]

## A. Whether The Opinion Decided A Substantial Issue Of Material Importance

The first requirement for interlocutory review is the existence of a decision that decided a substantial issue of material importance. The Opinion does not meet that standard.

---

[79] Supr. Ct. R. 42(b)(ii).

[80] *Id.* cmt.

[81] *Chemours Co. v. DowDuPont Inc.*, 2019 WL 2404817, at *1 (Del. Ch. June 7, 2019).

[82] Supr. Ct. R. 42(b)(i).

[83] Supr. Ct. R. 42(b)(ii).

[84] Supr. Ct. R. 42(b)(iii)(A)–(H).

### 1. The Opinion Is A Discovery Ruling.

"The 'substantial issue' requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters."[85] Under this standard, discovery rulings are generally not suitable for interlocutory appeal.[86] Discovery is entrusted to the trial court's discretion, and the Supreme Court "will not disturb a trial court's decision regarding sanctions imposed for discovery violations absent an abuse of that discretion."[87]

The Opinion is a discovery ruling. It did not decide a main question of law which relates to the merits of the case. It therefore did not decide a substantial issue.

### 2. The Defendants' Due Process Argument

The defendants do not argue directly that the Opinion decided a substantial issue. There is no section in the Application that expressly addresses the substantial issue test. But the defendants do assert that the substantial issue requirement is met when "an interlocutory order raises due process concerns affecting trial," and they assert that "[d]iscovery issues may constitute a substantial issue."[88] The Application

---

[85] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008); *accord Castaldo v. Pittsburgh–Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973).

[86] *Crowhorn v. Nationwide Mut. Ins. Co.,* 804 A.2d 1065 (Del. 2002) (TABLE); *McCann v. Emgee, Inc.,* 637 A.2d 827 (Del. 1993) (TABLE); *American Centennial Ins. Co. v. Monsanto Co.,* 582 A.2d 934 (Del. 1990) (TABLE); *Huang v. Rochen,* 550 A.2d 35 (Del. 1988) (TABLE); *Levinson v. Conlon,* 385 A.2d 717, 720 (Del. 1978); *Castaldo*, 301 A.2d at 87; *Lummus Co. v. Air Prods. & Chems., Inc.,* 243 A.2d 718, 719 (Del. 1968).

[87] *In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990).

[88] App. ¶ 6.

33

then jumps to arguing about the eight factors that can support certification, albeit under a heading titled, "The Opinion Deprives Defendants Of Due Process."[89] Read charitably, the Application contends that the Opinion decided a substantial issue because it raises due process concerns affecting trial.[90]

### a. The Defendants' Two Precedents

The defendants are undoubtedly correct that a sufficiently significant discovery ruling could constitute a ruling on a substantial issue suitable for interlocutory appeal. But the defendants have not identified any support for the notion that the Opinion is the type of discovery ruling that clears the bar. The two decisions that the Application cites during its terse discussion of the substantial issue requirement—*Forescout*[91] and *Pepsico*[92]—involved quite different issues. And in *Pepsico*, the Delaware Supreme Court rejected the interlocutory appeal.

In *Forescout*, during the early days of the COVID-19 pandemic, the defendants sought interlocutory appeal on three issues: (1) whether a witness could appear at trial virtually, (2) whether a witness could be compelled to testify live during the

---

[89] *Id.* at 4 (emphasis removed).

[90] Confusingly, the Application argues separately that the court deprived the defendants of due process when issuing the Opinion. But the defendants do not seem to view that alleged error as giving rise to a substantial issue. Rather, the defendants seem to think that issue (i) raises an issue of first impression and (ii) creates a conflict with other trial court decisions. This decision therefore does not address that version of the defendants' due process argument under the substantial-issue heading.

[91] *Forescout Tech. v. Ferrari Gp. Hldgs.*, 2020 WL 3971012 (Del. Ch. July 14, 2020).

[92] *Pepsico, Inc. v Pepsi-Cola Bottling Co.*, 261 A.2d 520 (Del. 1969).

pandemic, and (3) the whether the court erred by denying the defendants' motion to continue trial in light of the pandemic.[93] The court certified the first two issues because the defendants had "raised due process concerns regarding the right to live cross-examination, because [the witness] is a key Plaintiff witness, and because the overarching issue presented—whether a decision to take trial testimony remotely is consistent with due process and within the trial court's discretion—is one of first impression . . . ."[94] The court did not certify the third issue.[95]

The defendants act as if *Forescout* gives litigants license to seek interlocutory appeal whenever a ruling could affect how trial will proceed, but *Forescout* is far narrower. *Forescout* involved novel issues presented by the COVID-19 pandemic that restricted the use of live testimony at trial. The Opinion is a discovery-related sanctions ruling that does not limit the defendants' ability to introduce evidence at trial. It does not limit any defendant's ability to testify at trial. It does not affect the defendants' ability to issue trial subpoenas for witnesses to appear at trial. The Opinion only addresses the allocation of the burden of proof (because the presumptions shift the burden to the defendants on two issues) and the standard of proof that the defendants must meet (clear and convincing rather than a

---

[93] *Forescout*, 2020 WL 3971012, at *2–3.

[94] *Id.* at *3.

[95] *Id.*

preponderance of the evidence). Those are issues that the Delaware Supreme Court can review after a final judgment.[96]

In *Pepsico*, the Delaware Supreme Court acknowledged that interlocutory review might be warranted for "a discovery order involving matters such as privilege, self-incrimination, privacy, or trade secrets" or when the discovery ordered was "so burdensome as to be ruinous to the party, and so disproportionate to the amount in controversy as to amount to deprivation of due process, thus involving substantive rights and issues."[97] None of those scenarios apply here. The Opinion did not order any discovery. It drew adverse inferences on two issues and increased the defendants' burden of proof by one level. Again, those are issues that the Delaware Supreme Court can review after a final judgment.

The defendants' only two authorities thus do not support their implied assertion that the Opinion decided a substantial issue. That is because the Opinion is a discovery ruling that does not warrant interlocutory review.

---

[96] *See, e.g.*, *Am. Mining Corp. v. Theriault*, 51 A.3d 1213, 1218–19 (Del. 2012) (affirming post-trial decision where defendants contended that "the Court of Chancery committed reversible error by failing to determine which party bore the burden of proof before trial. They further claim the Court of Chancery erred by ultimately allocating the burden to the Defendants, because, they submit, the Special Committee was independent, well-functioning, and did not rely on the controlling shareholder for the information that formed the basis for its recommendation."); *Kahn v. Tremont Corp.*, 694 A.2d 422 (Del. 1997) (reversing post-trial decision where plaintiff contended "that the court erred in its burden of proof allocation regarding the entire fairness of the transaction" and holding that "under the circumstances the Special Committee did not operate in an independent or informed manner and therefore, the Court of Chancery erred in shifting the burden of persuasion to [plaintiff]."); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995) (considering "the precise standard of proof required" for "director interest materiality test").

[97] *Pepsico*, 261 A.2d at 521.

36

### b. The Defendants' Due Process Argument

Moving beyond their citations to *Forescout* and *Pepsico*, the defendants appear to argue that the Opinion decided a substantial issue because they think the sanctions the court imposed "guaranteed that Defendants will be deprived of a full and fair trial."[98] They also say that "[t]he tone of the Opinion makes clear that, even without testimony, the Court has concluded that Defendants were lying, thus rendering trial moot."[99]

Neither is true. The defendants will have a full and fair opportunity to present evidence at trial. The whole point of the Opinion was to ensure a fair trial despite the defendants' spoliation.

The Opinion did not make findings about credibility, nor did the Opinion make any findings on any issue touching on the merits of the case. Whether the defendants acted recklessly in failing to preserve texts is a different issue than whether they acted with *scienter* when trading in Bioverativ stock. The court has not addressed the latter issue, nor has the court reached any conclusions about it. The Opinion was not about the merits, and the trial is not moot.

Yes, the Opinion questioned the iPhone-upgrade explanation and the post-pool-incident-repair explanation. Those explanations had serious problems. An iPhone upgrade does not cause the loss of texts, the timing coincided with the

---

[98] App. ¶ 31.

[99] *Id.* ¶ 2.

plaintiff's document requests, and Denner had not consulted with outside counsel before the upgrade, as they had instructed him to do. DiPaolo's pool incident was disclosed belatedly, after full briefing and argument on the Sanctions Motion. It also involved a temporal disconnect: the repair ostensibly happened around September 28, 2020, yet he has no texts from before October 9, 2020. As the Opinion noted, it would be strange for a repair to cause the loss of text messages sent during the twelve days after the repair took place.[100] Finally, neither Denner nor DiPaolo suggested at that time that any other data had been lost. Losing all your data, contacts, and pictures is a hassle, yet they barely remembered the incidents.[101] Those are all fair criticisms.

Ultimately, the problems with Denner and DiPaolo's stories did not drive the outcome of the Opinion. The court reached only the issue of recklessness, not intentionality. For recklessness, the key fact was that Denner and DiPaolo lost their texts and did not know how. The reality-plagued explanations they offered were after-the-fact efforts to reconstruct what might have happened, and the plaintiff poked holes in those explanations. For purposes of recklessness, knowledge of their duty to preserve texts coupled with the loss of texts and the lack of any explanation was dispositive.[102]

---

[100] Op. at *6.

[101] *Id.* at *1, *6–7, *31.

[102] Relatedly, the Application claims that the Opinion is inconsistent because it (i) recognizes that an iPhone upgrade does not result in the loss of data but (ii) finds that Denner

38

The sanctions that the Opinion imposed also do not deny defendants of a fair trial. The Opinion granted the plaintiff's requests for rebuttable presumptions but rejected their requests for preclusion orders. Instead, the court increased the standard of proof that the defendants must meet to rebut those presumptions. At trial, the Court will "consider the testimony of Sarissa witnesses and give it the weight due . . . ."[103] If the defendants' witnesses are credible, they will win.

Finally, the defendants claim that the Opinion "radically expand[ed] trial" by requiring the defendants "to prove that the sale fell within a range of reasonableness, even though those *Revlon* claims were **settled and released**."[104] That is only partially true. The true part is that the plaintiff released the sale process claims when they settled Counts I and II, and released all of the defendants, including Sarissa and Denner. But the reasonableness of the sale remained in the case because of the basis for the plaintiff's standing.[105] The Opinion did not alter what the trial would address.

---

was reckless when he lost texts by upgrading his iPhone. App. ¶ 15. The first point is correct; the second isn't. Denner was reckless because he took no action to preserve his texts despite receiving three litigation holds and being told by outside counsel to consult with them before replacing his phone. No one really thinks that Denner lost his texts in the iPhone upgrade. Even defense counsel doubts that happened. *See* Dkt. 195, Ex. 19 at 2–3. Ultimately, the defendants admit that Denner does not know how he lost his texts. App. ¶ 11. He simply floated that story as a speculative possibility.

[103] Op. at *29.

[104] Appl ¶ 31.

[105] *See Insider Trading Decision,* 2022 WL 1797224, at *11 ("standing exists to assert a direct claim when a plaintiff alleges breaches of fiduciary duty that resulted in either an unfair price or an unfair process.").

### 3. No Substantial Issue

The substantial issue requirement is therefore not satisfied. The court could deny the Application on that basis alone. But because the Supreme Court, not this court, has the final say on whether to accept the defendants' interlocutory appeal, the court will address the other aspects of the Rule 42 inquiry.

### B. Whether The Opinion Merits Appellate Review Before A Final Judgment

A ruling addressing a substantial issue is a necessary but not sufficient condition for the certification of an interlocutory appeal. The trial court's ruling also must "merit[] appellate review before a final judgment."[106] When analyzing that issue, Rule 42(b)(iii) instructs trial courts to consider eight factors. The defendants rely on three.

### 1. Whether Decisions Of The Trial Courts Conflict

As their lead argument, the defendants seem to rely on factor (B), which supports certification when "[t]he decisions of the trial courts are conflicting upon the question of law."[107] Technically the defendants do not frame their argument in those terms. Instead, they assert that the Opinion "conflicts with Delaware law."[108] They advance three reasons why that is supposedly so. None establish an actual conflict.

---

[106] Supr. Ct. R. 42(b)(i).

[107] Supr. Ct. R. 42(b)(iii)(B).

[108] App. ¶ 8 ("[A]warding adverse inferences without a full record conflicts with Delaware law . . . ."); *see id.* ¶ 7 ("Interlocutory appeal is appropriate because the Opinion is inconsistent with Delaware law . . . ."); *id.* ¶ 16 ("Delaware law does not support making such findings of recklessness on an *ipse dixit* basis, without live testimony.").

### a.     The Supposed Requirement To Hear Live Testimony

The defendants argue that "awarding adverse inferences without a full record conflicts with Delaware law . . . ."[109] By that, they mean that before ruling on a sanctions motion seeking adverse inferences, a Delaware court must hear live testimony from the parties accused of spoliation, either by (i) deferring the motion until after trial, or (ii) holding an evidentiary hearing at which the accused spoliators testify. No such requirement exists.

Neither Rule 37 generally nor Rule 37(e) specifically requires an evidentiary hearing on discovery motions. Yet according to the defendants, the Court of Chancery "has previously only adjudicated motions for adverse inferences for spoliation with a full record or an evidentiary hearing."[110] In support of that proposition, they cite cases where the court has followed that course. But that does not mean that the court *must* follow that course. Contrary to the defendants' assertion, Delaware courts have previously imposed adverse inferences before trial and without an evidentiary hearing.[111]

---

[109] App. ¶ 8.

[110] *Id.* ¶ 10.

[111] *E.g.*, *Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. 2009) ("During the pretrial conference on March 4, 2009, I advised the parties that I would be denying the Motion to the extent it sought entry of a default judgment, but would grant an adverse inference to a limited extent and award Plaintiff their attorneys' fees and expenses in connection with the Motion."); *Fortis Advisors, LLC v. Dematic Corp.*, 2021 WL 2259398, at *2–3 (Del. Super. June 3, 2021) (ORDER) (denying certification of interlocutory appeal of pre-trial imposition of sanctions, including adverse inferences, for failure to produce evidence).

The defendants also claim that "[f]ederal courts are in accord, and hold evidentiary hearings when credibility is disputed."[112] In support of that proposition, they cite three decisions. One of them—*Wakefield*—rejected a spoliation motion on timeliness grounds, without holding a hearing.[113] That leaves two.

The second case—*Gold King*—shows that an evidentiary hearing may be required for complex spoliation issues. The plaintiff in that case sought sanctions against the federal government based on wide-ranging failures to preserve documents.[114] After reviewing over 400 pages of briefing, the court asked for still more briefing.[115] Then, when the federal government moved to establish a briefing schedule, the court denied the motion and decided to hold an evidentiary hearing, citing the complexity of the alleged spoliation and the need "to evaluate the credibility of the witnesses."[116] The case supports holding an evidentiary hearing when warranted, but not much else.

The third case is similar. In *Bernholt*, the court scheduled an evidentiary hearing where the parties were "at loggerheads as to [the] nature of any documents

---

[112] App. ¶ 10 (citing *In re Gold King Mine Release*, 2022 WL 741882, at *4 (D.N.M. Feb. 1, 2022); *Bernholt v. Allen*, 2021 WL 2823409, at *4 (D. Neb. 2021); *Wakefield v. ViSalus, Inc.*, 2019 WL 1411127, at *4 (D. Or. March 27, 2019)).

[113] *Wakefield*, 2019 WL 1411127, at *1.

[114] *Gold King*, 2022 WL 741882, at *1–2.

[115] *Id.* at *1.

[116] *Id.* at *4

42

destroyed" and had submitted conflicting declarations about what happened.[117] On those facts, scheduling a hearing made sense. In this case, no one disputed the critical facts.

In contrast to the defendants' sparse and terse authorities, a host of federal decisions state expressly that a trial court has discretion regarding whether to hold

---

[117] 2021 WL 2823409, at*4.

an evidentiary hearing before imposing sanctions for spoliation, even when intent is at issue.[118] That is what the Opinion said too.[119]

The Opinion then explained how different considerations could affect how a court proceeded regarding a Rule 37(e) motion:

> When to address a spoliation issue depends on a variety of factors, including the nature of the issue, the stage of the case, the court's ability to provide case-specific relief, and any scheduling order that might

---

[118] *See Gypsum Res., LLC v. Clark Cty.*, 2022 WL 16951250, at *3 (D. Nev. Nov. 15, 2022) (noting that a district court "has discretion, but is not required, to hold an evidentiary hearing prior to imposing sanctions" for spoliation); *Off. Comm. of Unsecured Creditors of Exeter Hldgs. Ltd. v. Haltman*, 2016 WL 128154, at *3 (E.D.N.Y. Jan. 12, 2016) ("the decision to hold an evidentiary hearing is discretionary."); *In re Dynex Cap., Inc. Sec. Litig.*, 2011 WL 2581755, at *3 (S.D.N.Y. Apr. 29, 2011) ("[I]t is within the Court's discretion to hold an evidentiary hearing on a sanctions motion, although no such hearing is required."), *report and recommendation adopted*, 2011 WL 2471267 (S.D.N.Y. June 21, 2011); *Stoian v. Colvin*, 2015 WL 13918816, at *3 (C.D. Cal. Nov. 19, 2015) ("In this case, the Court concludes that an evidentiary hearing is not necessary, because the overwhelming evidence demonstrates that Plaintiff willfully, and in bad faith, falsified and fabricated evidence. Moreover, based on this record, even if the Court were to hold an evidentiary hearing, the Court would reject Plaintiff's testimony as not credible."); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 257 F.R.D. 334, 341 (D. Conn. 2009) ("Therefore, the Court concludes that the undisputed evidence shows that Innis Arden breached its duty to preserve its sampling evidence and associated data. Consequently, no evidentiary hearing on Pitney Bowes's state of mind and failure to act, as requested by Innis Arden, is necessary. Given this conclusion, the next question is what sanction, if any, should follow."); *see also Whitten v. Johnson*, 2022 WL 885773, at *6 (W.D. Va. Mar. 25, 2022) ("[I]f necessary, the court will conduct a pretrial evidentiary hearing to determine whether spoliation of video evidence occurred and, if it did, whether a spoliation sanction is warranted."); *Echavarria v. Am. Valet Parking Mgmt., Inc.*, 2015 WL 12746112, at *3 (S.D. Fla. June 17, 2015) ("An evidentiary hearing on whether spoliation sanctions are appropriate will be set at a later date, if necessary."); *Botell v. United States*, 2013 WL 2106033, at *1 (E.D. Cal. May 14, 2013) ("The court will notify the parties whether an evidentiary hearing regarding the spoliation of evidence as it relates to defendant's discretionary function defense is necessary.") (ORDER). *Cf. Pac. Harbor Cap., Inc. v. Carnival Air Lines, Inc.,* 210 F.3d 1112, 1118 (9th Cir. 2000) (holding when determining whether an attorney has acted in bad faith, due process "does not require an oral or evidentiary hearing on the issue" and that "[t]he opportunity to brief the issue fully satisfies due process requirements."); *Resol. Tr. Corp. v. Dabney*, 73 F.3d 262, 268 (10th Cir. 1995) (same).

[119] Op. at *14.

44

apply. If a party seeks an order compelling the defendants to provide additional discovery or to pay for the movant to conduct additional discovery, then it would be foolish to defer the motion until trial. If a ruling on the motion will help the parties prepare for trial or limit the issues to be addressed at trial, then it often will make sense to address the motion before trial. If the motion turns on evidentiary issues that the court will evaluate at trial, then it will make sense to defer the motion until trial. Ultimately, the decision rests in the discretion of the court based on the facts of each case.[120]

The Opinion also cited two federal decisions that identified similar considerations.[121]

After considering these factors, the Opinion concluded that ruling on the Sanctions Motion was warranted because the outcome would affect "how the parties plan for trial and present evidence."[122] If the court had waited and imposed similar sanctions after trial, the defendants likely would have argued that their due process rights were violated because they did not have advance notice that the court would draw adverse inferences or impose a heightened evidentiary burden.

---

[120] *Id.* (footnote omitted).

[121] *Id.* at *14 n.10 (first citing *Gruenstein v. Browning*, 2022 WL 3213261, at *3 (N.D. Ill. June 21, 2022); then citing *GMS Indus. Supply, Inc. v. G&S Supply, LLC*, 2022 WL 853626, at *4 (E.D. Va. Mar. 22, 2022)).

The Opinion observed in passing that a review of federal decisions suggests that the principal problem federal courts face involve parties raising spoliation issues too late, rather than too early. Op. at *14 & n.9 (citing *GMS Indus.*, 2022 WL 853626, at *4 (analyzing whether motion was filed late); *McEachron v. Glans*, 1999 WL 33601543, at *2 (N.D.N.Y. June 8, 1999) (collecting authorities); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 108 (E.D. Va. 2018)). The defendants say that those cases "discuss how a party moving for spoliation may impermissibly prejudice ***the alleged spoliator*** by moving after discovery closes . . . ." App. ¶ 25. That is not a response. The federal decisions show that a post-trial adjudication of a spoliation issue can be problematic.

[122] Op. at *14.

The defendants denigrate the discretionary considerations inherent in determining how to proceed on a sanctions motion. They assert boldly that the requirement to hold an evidentiary hearing "is not a matter of 'timing.' ***It is a matter of due process.***"[123] Not so.

Federal courts of appeals have specifically addressed this question and rejected the defendants' position. One stated:

> When necessary, the district court may hold an evidentiary hearing on a motion for sanctions. Hence, the district court has the discretion, but is not required, to hold an evidentiary hearing prior to imposing sanctions on a party. Indeed, in cases in which the sanctioned party argued that it was deprived of due process because the district court failed to conduct an evidentiary hearing, . . . we have held that the opportunity to brief the issue fully satisfies due process requirements.[124]

Another explained:

> The opportunity to be heard does not necessarily entitle the subject of a motion for sanctions to an evidentiary hearing. An evidentiary hearing serves as a forum for finding facts; as such, its need can be obviated when there is no disputed question of fact or when sanctions are based entirely on an established record.[125]

---

[123] App. ¶ 24.

[124] *Lambright v. Ryan*, 698 F.3d 808, 825–26 (9th Cir. 2012) (cleaned up); *see Anderson v. BNSF Railway Co.*, --- F.Supp.3d ---, 2023 WL 4418221, at *3–4, *11 (S.D. Iowa July 6, 2023) (rejecting request for evidentiary hearing on sanctions motion, deciding motion without oral argument, and imposing sanctions).

[125] *In re Reed,* 888 F.3d 930, 938 (8th Cir. 2018) (quoting *Schlaifer Nance & Co. v. Est. of Warhol,* 194 F.3d 323, 335 (2d Cir. 1999) (internal citation omitted)).

That reasoning comports with "the fundamental requirement of due process," which is "the opportunity to be heard at a meaningful time and in a meaningful manner . . . ."[126]

Here, the plaintiff filed the Sanctions Motion on November 14, 2023.[127] That motion put the defendants on notice of what they faced. On November 29, the defendants submitted a 2,998-word opposition, supported by a transmittal affidavit that attached thirty-six exhibits covering 309 pages.[128] After the plaintiff filed their reply, the court held a hearing at which two lawyers presented argument for the defendants.[129] When defense counsel could not answer basic questions about their document collection process, the court instructed the defendants to submit an affidavit so that they "had the opportunity to document what they had done."[130] In total, the defendants submitted three post-hearing affidavits, a letter, and two more exhibits.[131] After receiving and considering those documents, the court issued the Opinion. That is not a lack of due process. That is a lot of due process.

When making their due process pitch, the defendants turn to a transcript ruling and a letter ruling to argue that Delaware law always requires an evidentiary

---

[126] *Kahn v. U.S.,* 753 F.2d 1208, 1218 (3rd Cir. 1985).

[127] Dkt. 195.

[128] Dkt. 199.

[129] Dkt. 231.

[130] Op. at *10.

[131] Dkts. 212 & 215.

hearing on pain of a due process violation. In the transcript ruling, Vice Chancellor Will stated that as to one party charged with spoliation, "I can't possibly make credibility determinations or assess his state of mind on the record that I have before me right now."[132] That was a case-specific ruling, not a quasi-legislative determination that an evidentiary hearing is always required. Confirming that, she noted that "our courts *often* make spoliation findings just before or after trial, on a better-developed evidentiary record, or at least at an evidentiary hearing."[133] Often. Not always.

The defendants also rely on one of Chancellor McCormick's many letter rulings in the highly expedited *Twitter* case. In their seventh discovery motion, the plaintiff sought an adverse inference that Elon Musk had recklessly or intentionally withheld damaging text messages.[134] Based on the paper record that the parties submitted, the Chancellor found it "likely that Defendants' custodians permitted the automatic deletion of responsive Signal communications between them and possibly others, and that those communications are irretrievably lost."[135] But she could not determine whether the defendants were under a duty to preserve evidence at that point. She held that "[i]f Defendants deleted documents after they were under a duty to

---

[132] *Fortis Advisors, LLC v. Johnson & Johnson,* C.A. No. 2020-0881-LWW, at 132 (Del. Ch. June 5, 2023).

[133] *Id.* (emphasis added).

[134] *Twitter v. Musk*, 2022 WL 5078278, at *1 (Del. Ch. Oct. 5, 2022).

[135] *Id.* at *5.

preserve, some remedy is appropriate, but the appropriate remedy is unclear to me at this stage. I will reserve my ruling regarding Plaintiff's request for sanctions, including adverse inferences, pending post-trial briefing, when I have a fuller understanding of the record."[136]

If the Chancellor had been able to determine from the paper record whether a duty to preserve existed, and if she had been confident in the appropriate remedy, then her ruling indicates that she would have imposed one based on the paper record. The undisputed facts of this case enabled the Opinion to do just that.

As further support for its mandatory-evidentiary-hearing argument, the Application states incorrectly that "[t]he sole case the Court cites for finding recklessness was issued after trial."[137] For starters, that was not the sole case on which the Opinion relied when finding recklessness; the Opinion cited at least six others.[138] And while it is true that *Triton* was a post-trial decision, the court's finding of recklessness turned on the fact that the spoliator "presented no evidence that he

---

[136] *Id.*

[137] App. ¶ 16 (referring to *Triton Const. v. E. Elect. Servs.*, 2009 WL 1387115 (Del. Ch. May 18, 2009)).

[138] When stating the standard for recklessness, the court cited *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1192 (Del. Ch. 2009). Op. at *29–30. For the proposition that a court can rely on either direct or circumstantial evidence to find recklessness, the court cited *In re Skanska USA Civil Southeast, Inc.*, 340 F.R.D. 180, 188 (N.D. Fla. 2021), *E*Trade Sec., LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 590 (D. Minn. 2005), and *Paisley Park Enterprises v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019). Op. at *30. As an example of a Delaware decision finding recklessness, the court cited *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *29 (Del. Ch. July 22, 2015). Op. at *30. The court also cited *Gener8 LLC v. Castanon*, 2023 WL 638163, at *15 (Del. Ch. Sept. 29, 2023)). Op. at *32.

took any steps to preserve the thumb drive or home computer[, but rather] effectively threw up his hands in bewilderment as to what happened to them."[139] That is what Denner and DiPaolo did. They did not know how they lost their texts, and the explanations they offered did not make sense.

The weight of authority thus establishes that an evidentiary hearing is not required as a matter of law, on pain of a due process violation. But doubtless a court could abuse its discretion by not holding an evidentiary hearing when one was plainly required.

On the facts of this case, holding an evidentiary hearing was not required. True, "Defendants submitted sworn attestations that they did not act intentionally or recklessly."[140] But the Opinion did not hold that Denner and DiPaolo intentionally deleted texts. The court deferred that issue to trial, just as the defendants wanted.

The Opinion instead held that Denner and DiPaolo acted recklessly by not preserving their texts. On that issue, if Denner or DiPaolo had been in a position to testify about what they did to preserve their texts and how they nevertheless lost them, then an evidentiary hearing might have been warranted. But it was undisputed that Denner had no texts from before October 2021, that he took no action to preserve them, and that that he does not know how or why his texts were lost. It was also

---

[139] *Triton*, 2009 WL 1387115, at *8.

[140] App. ¶ 11.

50

undisputed that DiPaolo had no texts from before October 2020, that he took no action to preserve them, and that he does not know how or why his texts were lost.

The defendants stress in the Application that DiPaolo thinks that "it is possible that he lost [his texts] before this litigation began."[141] That is true. It is also irrelevant. What matters is whether DiPaolo lost them after he had an obligation to preserve them, which he did.[142] And what matters for purposes of recklessness is whether DiPaolo knew he was obligated to preserve them and consciously ignored that obligation.[143] He plainly knew he was obligated to preserve them, because he sent the Sarissa Hold. He then did nothing to comply with the obligation he knew he owed.

Finally, the Application asserts that "DiPaolo is an attorney who respectfully requested the opportunity to testify fully in a sworn affidavit, and the Court should have heard his testimony before discrediting him out of hand."[144] Justice should not vary depending on who a person is or what professional qualifications they have. A person's status as an attorney does not excuse them from submitting evidence to support their positions. On the issue of recklessness, DiPaolo did nothing to preserve his texts and had no idea how he lost them. He could only speculate about the

---

[141] *Id.*

[142] *See Twitter*, 2022 WL 5078278, at *5.

[143] *See Beard Rsch.*, 981 A.2d at 1192.

[144] *Id.* ¶ 14.

swimming pool incident, yet the dates for explanation did not match up. The court did not "discredit[] him out of hand." The court carefully considered the evidence that the parties submitted.[145]

The question at hand is whether the Opinion conflicts with other decisions from the trial courts such that an interlocutory appeal is warranted under factor (B) of Rule 42. There is no conflict as to the court's discretionary determination that an evidentiary hearing was not required.

### b. The Supposed Conflict Over A "Helpfulness" Requirement

In a second effort to create a conflict among trial court decisions, the defendants argue that the court should have analyzed whether any missing documents would have been helpful to the plaintiff.[146] They claim that the Opinion's analysis conflicts with *TR Investors, LLC v. Genger*, which stated that the aggrieved party "must show a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the lost material would have produced evidence favorable to his cause."[147]

---

[145] *See* Op. at *29–32. Along the same lines, the defendants argue that "Delaware law does not support making such findings of recklessness on an *ipse dixit* basis . . . ." App. ¶ 16. The court did not make *ipse dixit* findings. The court carefully examined the record. *See* Op. at *29–32. The only *ipse dixit* assertions were Denner and DiPaolo's naked contentions that they were not reckless.

[146] App. ¶ 17.

[147] 2009 WL 4696062, *18 n.73 (Del. Ch. Dec. 9, 2009) (cleaned up), *aff'd*, 26 A.3d 180 (Del. 2011).

The defendants did not argue this point in their opposition to the Sanctions Motion. Their only citation to *Genger* appeared in the midst of a footnoted string cite, where they described the case as "granting sanctions for authorizing an agent to destroy evidence identified by his own counsel as responsive."[148] Their opposition to the Sanctions Motion also did not cite *Happy Child*, a decision that quoted *Genger*.[149]

The court engaged with this issue because Rule 37(e) now requires a finding of prejudice. The *Genger* decision was issued before the adoption of Rule 37(e). The *Happy Child* ruling post-dated the adoption of Rule 37(e), but its brief discussion of why no spoliation had occurred did not touch on Rule 37(e).

When addressing the element of prejudice, the Opinion held that "when showing prejudice from spoliation, the requesting party must provide some minimal explanation as to why the lost ESI could have been relevant and either admissible in its own right or reasonably likely to lead to the discovery of admissible evidence."[150] If the movant meets this standard, then the party that failed to preserve the ESI "must convince the court that the lost material could not have been relevant, would not have been admissible or potentially have led to the discovery of admissible

---

[148] Dkt. 199 ¶ 31 n.6.

[149] *See* App. ¶ 9 (citing *In re Happy Child World*, 2020 WL 5793156, *9 (Del. Ch. Sept. 29, 2020)).

[150] Op. at *27.

evidence, or otherwise could not have been used by the requesting party to its advantage."[151]

That standard is functionally the same as the *Genger* case. Setting aside the *Genger* court's reference to a "fertile imagination," both *Genger* and the Opinion contemplate that the party seeking sanctions must initially come forward with some reason why the lost ESI would have been helpful. If the movant makes that showing, then the respondent must show otherwise. The main semantic distinction is that the Opinion used the phrase "minimal explanation," whereas *Genger* says, "reasonable possibility." That is not a meaningful divergence. An unreasonable possibility would not rise to the level of a minimal explanation. Nor would an explanation based on impossibility. A minimal explanation requires a reasonable possibility.

Here, the plaintiff pointed to ESI that was specifically known to exist. Based on texts that other parties produced, the plaintiff established that Denner texted about the Bioverativ-Sanofi deal process. There is also no dispute that the texts were lost. The plaintiff provided a reasonable explanation that Denner's texts would have shown what he was doing and when during the critical time period after Sanofi's initial approach and through the trading window when Sarissa accumulated its block of shares.

Nothing more is required. Precisely because the texts were lost, the plaintiff can't point to the specific wording of a specific text sent on a specific day. If the

---

[151] *Id.*

54

plaintiff had that information, then that text would not have been lost for purposes of Rule 37(e).

Once again, the question at hand is whether the Opinion conflicts with other decisions from the trial courts such that an interlocutory appeal is warranted under factor (B) of Rule 42. There is no conflict as to the test that the Opinion articulated.

### c. The Supposed Conflict Over The Sanctions Imposed

In their third effort to create a conflict between trial court decisions, the defendants argue that "the sanctions are disproportionate."[152] A discretionary decision to impose sanctions on the facts of one case does not create a conflict with a discretionary decision to impose different sanctions on the facts of a different case.

As the foundation of their disproportionate sanctions argument, the defendants claim that the court "has issued the most severe sanctions available short of a default judgment."[153] That is demonstrably incorrect. The court could have issued evidentiary preclusion orders, which Rule 37(b)(2)(B) contemplates and the plaintiff requested. The court could have found facts contrary to the defendants' position, as Rule 37(b)(2)(A) permits. The court could have stricken defenses, as Rule 37(b)(2)(C) allows.

Instead, the court granted the rebuttable inferences that the plaintiff requested. In lieu of granting the evidence preclusion orders that the plaintiff sought,

---

[152] App. ¶ 21.

[153] *Id.* ¶ 31.

the court elevated the defendants' burden of proof by one level. Now, rather than having to rebut the inferences by a mere preponderance of the evidence, the defendants will have to offer clear and convincing evidence.

The defendants say that the Opinion "applies the same sanctions as *Genger.*"[154] That is also demonstrably incorrect. The *Genger* court imposed two additional sanctions. The court held that "because Genger has diminished the evidence base that would otherwise be available to the Trump Group, . . . he must produce relevant documents to which he may have otherwise made a claim of privilege."[155] The Opinion did not do that.

The *Genger* court also required corroborating evidence for any testimony by the sanctioned party, holding that

> because Genger's conduct leaves me with severe doubts about his credibility, Genger will be unable to prevail on any material factual issue if the only evidence in support of his position is his own testimony. Absent corroborating testimony or documents, his mere word will be insufficient to meet his burden of persuasion.[156]

The Opinion did not do that either.

Contrary to the defendants' assertion, the Opinion imposed lesser sanctions than *Genger*, as warranted by the case's different facts. The sanctions are reasonable and proportionate in light of the defendants' loss of their texts. The defendants intend

---

[154] App. at ¶ 21.

[155] *Genger*, 2009 WL 4696062, at *19.

[156] *Id.*

to rely extensively at trial on witness testimony; there are very few contemporaneous documents. In that setting, placing the burden on the defendants to rebut two inferences and elevating their standard of proof by one level is a moderate consequence. The case is likely to come down to witness credibility. If the defendants' witnesses testify credibly, then they will win.

### d. No Conflict Among Trial Court Decisions

As noted, the defendants ground their principal argument for interlocutory review on the supposed existence of a conflict between the Opinion and other trial court rulings. There is no conflict. Factor (B) does not provide a basis for certification.

### 2. Whether The Opinion Involves A Question Of First Impression

The defendants next turn to factor (A) of Rule 42, which asks whether the "[i]interlocutory order involves a question of law resolved for the first time in this State."[157] The defendants contend that "awarding adverse inferences without a full record . . . presents a question of first impression."[158] They also contend that the Opinion adopted a "new discovery rule" that "warrants interlocutory review."[159]

The argument about adverse inferences without a full record is a rehash of the defendants' first argument under factor (A). There is no need to repeat that

---

[157] Supr. Ct. R. 42(b)(iii)(A).

[158] App. ¶ 8; *see id.* ¶¶ 22–25.

[159] *Id.* ¶ 26.

57

discussion, except to note again that the Opinion is not the first decision to have done it.[160]

The contention that the Opinion adopted a new discovery rule is equally misguided. The defendants set up a strawman by mispresenting the Opinion. They claim that,

> [t]he Opinion imposed new, difficult-to-impossible discovery standards, and penalized Defendants for not satisfying them. The Court held that Defendants acted **recklessly** by not imaging employee phones upon receipt of a litigation hold in February 2018—almost three years before this action commenced. The Opinion requires every **potential** litigant in Delaware to undergo the costly and invasive process of creating full forensic images of every potential custodian's phones every time they anticipate litigation. To do otherwise constitutes recklessness warranting adverse inferences.[161]

That is not a fair characterization.

Nothing about the Opinion was new. The court applied Court of Chancery Rule 37(e), which is an existing rule governing preservation of ESI.[162] The common law principles against spoliation date back over seven decades.[163] The Delaware Supreme Court held that recklessness was sufficient to support adverse inferences in 2006.[164]

---

[160] *See* n.111, *supra.*

[161] App. ¶ 3.

[162] Op. at *1–2, *11, *14–32.

[163] *See Equitable Tr. Co. v. Gallagher*, 102 A.2d 538 (Del. 1954).

[164] *See Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542 (Del. 2006)

The Opinion did not announce a blanket rule that "every potential litigant in Delaware [must] undergo the costly and invasive process of creating full forensic images of every potential custodian's phones every time they anticipate litigation."[165] The Opinion reiterated the longstanding rule that (i) a party who anticipates litigation has a duty to preserve potentially relevant information—including text messages—and (ii) reckless noncompliance with that duty can lead to sanctions. As the Opinion explained, a party meets this duty by acting "reasonably to preserve the information that it knows, or reasonably should know, could be relevant to the litigation, including what an opposing party is likely to request."[166]

Contrary to the defendants' alarmist framing, the Opinion did not hold that everyone who might be a custodian in a Delaware action must image their phones immediately after receiving a litigation hold. Yes, the Opinion states that the defendants, "should have taken steps to preserve ESI, including by imaging phones or backing up their data. . . . In a world where people primarily communicate using personal devices, it will almost always be necessary to image or backup data from phones."[167] But the defendants seem not to understand the disjunctive conjunction

---

[165] App. ¶ 3; *accord id.* ¶ 27 ("Now everyone must image their phones—at the latest— upon receiving a litigation hold."); *id.* ¶ 28 ("[T]he Court has mandated forensic imaging every time anyone might anticipate litigation in Delaware.").

[166] Op, at *18 & n.19 (collecting cases).

[167] Op, at *21.

"or." The sentence that the defendants pick out spoke of *either* making an image *or*

backing up data.[168]

---

[168] The defendants also do not seem to understand the cases they cite. They assert that "[f]ederal authority disfavors imaging because it is incredibly invasive." App. ¶ 28. But the cases they cite address whether courts should issue orders compelling parties to produce forensic images to their opponents. Those cases do not address the use of imaging as a data preservation technique in which a client's own lawyer or data security consultant makes and retains the image. Those are very different things. *See J.B. v. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (discussing the power to compel forensic imaging; noting that "forensic imaging is not uncommon in the course of civil discovery" and that "[a] party may choose on its own to preserve information through forensic imaging," but cautioning that "compelled forensic imaging is not appropriate in all cases, and courts must consider the significant interests implicated by forensic imaging before ordering such procedures."); *Corum v. Wensley*, 2023 WL 6192728, at *4 (E.D. Tenn. July 19, 2023) (denying motion to compel forensic image of phone without prejudice where plaintiff failed to file a reply in support of the motion and the defendant offered the less intrusive method of a subpoena to Facebook to obtain his Facebook messages); *Wright v. Rio Tinto Am.*, 2021 WL 5417037, at *3 (D. Utah Nov. 19, 2021) (denying motion to compel forensic image of phone while ordering production of text messages); *FCA US LLC v. Bullock*, 329 F.R.D. 563, 569 (E.D. Mich. 2019) (denying motion to compel production of a mirror image of defendant's personal devices but requiring the defendant to produce deleted files); *Hardy v. UPS Ground Freight,* 2019 WL 3290346, at *3 (D. Mass. July 22, 2019) (denying motion to compel production of a full forensic image of plaintiff's phone where there were less intrusive methods to obtain information); *Cross by & Through Steele v. XPO Express, Inc.*, 2016 WL 11519221, at *7 (D.S.C. May 3, 2016) (denying motion to compel production of forensic image but ordering defendant to "conduct a search of his laptop to determine whether it contains any responsive documents" and "to confer with Plaintiff as to his search methodology and agree to a specific ESI protocol."). Not only that, but in one of the cases the defendants cite, the court compelled the creation and production of a forensic image of a phone. *See France v. Chippewa Cty.*, 2021 WL 11431784, at *3 (W.D. Mich. Nov. 22, 2021) ("France's motion to compel the forensic imaging of Savoie and German's cellular devices is hereby GRANTED."). Doubtless there are other decisions that have granted that relief.

The defendants also refer to the Advisory Committee's notes to the Federal Rules of Civil Procedure, which they say "cautions against" making "forensic examination the default." App. ¶ 28. The operative rule is Rule 37(e), and it was adopted in 2015. The defendants rely on two cases from 2009 that cite the Advisory Committee notes to the 2006 version of Rule 34. *Id.* at ¶ 28 n.6 (first citing *Covad Commc'ns v. Revonet*, 258 F.R.D. 5, 11–12 (D.D.C. 2009); then citing *White v. Graceland Coll. Ctr.*, 2009 WL 722056, *7–8 (D.Kan. 2009)). That set of Advisory Committee's notes addressed the ability of an adverse party to obtain "direct access to a party's electronic information system." Fed. R. Civ. P. 34(a)(1), advisory committee's notes to 2006 amendment. It does not deal with how a party fulfills its preservation obligations. The two cases the defendants cite contain the quotation from the

The Opinion did not establish a rigid checklist or bright line rule. It reiterated that parties must take reasonable steps to preserve evidence in a world where texts are often a source of evidence. A party can image or back-up a device to ensure there is no data loss. Or a party could turn off auto-delete features and let the texts accumulate. Or a party could just collect the text messages.

Nothing about that is novel. In holding that the duty to preserve evidence extends to texts, the court cited a rage of authorities dating back two decades to the seminal decision commonly known as *Zubulake IV*.[169] The Opinion explained how parties and their counsel can meet the reasonableness standard by following the well-understood steps of a document discovery process: (1) identification, (2) preservation, (3) collection, (4) review, and (5) production.[170]

In this case, the defendants blew it on the first two steps. They did not identify key custodians, and they did not take reasonable steps to preserve evidence. Despite receiving three litigation holds, they did not take any concrete steps to identify sources, preserve ESI, or collect text messages until one year into the case. Defense

Advisory Committee notes that the defendants like, but the cases actually grant relief to the party seeking direct access to an opposing party's electronic information system. The *Covad* decision ordered a party to make forensic images to preserve the data on particular servers, then also ordered full forensic searches of the servers. 258 F.R.D. at 10, 13. The *White* decision denied a plaintiff's request for a full forensic image, but held that the plaintiff had "shown sufficient circumstances to allow some type of direct access to the [defendants'] computer hard drives . . . ." 2009 WL 722056, at *7–9. Like the Advisory Committee notes, those authorities are not talking about how a party fulfills its own obligation to preserve evidence.

[169] *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003).

[170] Op. at *19–21.

counsel did not conduct custodian interviews of potential custodians. Denner and DiPaolo did not take steps to back up the data on their phones. Denner switched phones without consulting counsel, despite counsel's instruction to the contrary. Another custodian never turned off his auto-delete setting. And counsel failed to timely investigate whether any of the defendants' custodians had relevant texts.

The defendants close with a nice rhetorical flourish that they tie to their due process theme. They say:

> To make matters worse, the Court applied its new rule as proof of Defendants' recklessness. But Defendants did not know in 2018 that the Court would decree—six years later—that failure to image phones was reckless. The Court's retroactive application of its new discovery rule violates Defendants' due process [sic].[171]

This criticism rests on a false premise. The Opinion did not adopt a new rule, much less the rule that the defendants posit.

The Opinion did not decide a question of first impression. It applied existing law to the facts. Factor (A) does not apply.

### 3. Whether Review Would Serve Considerations Of Justice

As their final basis for interlocutory appeal, the defendants invoke factor (H), which asks whether "[r]eview of the interlocutory order may serve considerations of justice."[172] That factor does not apply either.

---

[171] App. ¶ 29.

[172] Supr. Ct. R. 42(b)(iii)(H).

Under this heading, the defendants reprise their other arguments. They reiterate their incorrect claim that the Opinion "issued the most severe sanctions available short of a default judgment."[173] For the reasons already discussed, the Opinion did not do that. They also reiterate their claim that the court prejudged the defendants' credibility and "essentially guaranteed that Defendants will be deprived of a full and fair trial."[174] For the reasons already discussed, the Opinion did not do that either. And they reiterate their assertion that the court expanded the scope of trial by granting an inference on the reasonableness of the sale process.[175] As discussed previously, that issue remains relevant for purposes of the plaintiff's standing. The defendants do not face any liability on a sale process claim. If they are content not to contest the plaintiff's standing, they can ignore the sale process.

The defendants even reprise their contentions about a failure of due process. This time, however, they introduce a new case: *Rogal v. American Broadcast Companies*.[176] That decision does not help them.

In *Rogal*, the United States Court of Appeals for the Third Circuit reversed an order imposing monetary sanctions on the plaintiff for testifying falsely at trial because the district court did not hold a separate evidentiary hearing on the

---

[173] App. ¶ 31 (citing *Genger*, 2009 WL 4696062, at *18).

[174] *Id.*

[175] *Id.*

[176] 74 F.3d 40 (3d Cir. 1996).

defendants' sanctions motion.[177] The trial court did not believe an additional hearing was necessary because the judge had witnessed the false testimony first hand and the parties went through two rounds of briefing.[178] The appellate court reaffirmed the absence of "any rigid rule" as to whether an evidentiary hearing is required.[179] The appellate court nevertheless held that on the facts of the case, an evidentiary hearing was necessary because the plaintiff "did not have the same incentive at trial to try to clear up all of the apparent contradictions and inconsistencies in his testimony or to try to show his good faith as he would have had at an evidentiary hearing on the question of sanctions."[180] The appellate court emphasized that its "holding [was] a narrow one and depend[ed] heavily on the specific nature of [the plaintiff's] alleged misrepresentations and the relationship of each instance of contradictory or inconsistent testimony to the central issues of the litigation."[181]

In this case, the question of sanctions was not bound up with a trial on the merits; it was the only issue the defendants needed to address. And the defendants had ample opportunity. The plaintiff filed the Sanctions Motion, which spelled out the conduct and identified the sanctions sought. The defendants opposed the

---

[177] *Id.* at 44.

[178] *Id.* at 42–45.

[179] *Id.* at 44 (quoting *Jones v. Pittsburgh Nat. Corp.*, 899 F.2d 1350, 1358 (3d Cir. 1990) (internal quotation marks omitted)).

[180] *Id.* at 45.

[181] *Id.*

Sanctions Motion and submitted documentary evidence. The court held a hearing and asked questions of counsel, then gave counsel the opportunity to submit affidavits. The defendants submitted three post-hearing affidavits, a letter, and two additional exhibits. The defendants had every incentive to justify their conduct and clear up any apparent contradictions and inconsistencies. Instead, they kept digging themselves deeper. The *Rogal* decision does not suggest that an evidentiary hearing was necessary.

The defendants' arguments do not fare any better when repeated under factor (H). Considerations of justice will not be served by certifying an interlocutory appeal. The catchall factor does not apply.

## C. The Balancing

As a final step, Rule 42 directs the trial court to engage in balancing:

> After considering [the eight] factors and its own assessment of the most efficient and just schedule to resolve the case, the trial court should identify whether and why the likely benefits of interlocutory review outweigh the probable costs, such that interlocutory review is in the interests of justice. If the balance is uncertain, the trial court should refuse to certify the interlocutory appeal.[182]

There must be "substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal."[183]

Recognizing that the decision is ultimately up to the Delaware Supreme Court, the court does not see any benefit to an interlocutory appeal at this stage. A five-day

---

[182] Supr. Ct. R. 42(b)(iii).

[183] Supr. Ct. R. 42(b)(ii).

65

trial is set for April 29, 2024 through May 3, 2024, just two months away. It seems unlikely that an interlocutory appeal could be resolved in the roughly two months before the start of trial without significant burden on the Delaware Supreme Court. Granting an interlocutory appeal would likely result in a postponement of trial.

Not only that, but the defendants may well prevail at trial. Although the lead defense lawyer now seems to have lost confidence in his case, he previously argued that "I think you will find Mr. DiPaolo a very credible witness."[184] He also stressed that the defendants would present evidence from Denner and Scott Barshay, a partner at Paul Weiss. If the court finds their testimony credible, then the defendants will win. If that happens, then the current dispute over adverse inferences and an increased standard of proof will be moot.

By contrast, if the plaintiff wins at trial, then the defendants can appeal on a complete record, and they can raise all of their points of error at once. This is not a case where an interlocutory appeal will result in a trial of different claims or the presentation of different evidence.

On balance, the probable costs of an interlocutory appeal outweigh its potential benefits. While it is always helpful to have the Delaware Supreme Court's view on any issue, this is not a situation where interlocutory review is warranted.

---

[184] Dkt. 231 at 34.

### III.   CONCLUSION

Ultimately, whether to permit an interlocutory appeal lies in the discretion of the Delaware Supreme Court. The justices' views, not the trial court's, determine whether the defendants' request will be granted. This court's role under Rule 42 is to make a recommendation. In this case, that recommendation is for the Delaware Supreme Court to refuse the interlocutory appeal.